Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:    516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOURTHER DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL DANIELS,<br><br>          Plaintiff,<br><br>     v.<br><br>PPD, INC., DAVID SIMMONS, JOE BRESS, STEPHEN ENSLEY, MARIA TERESA HILADO, COLIN HILL, JEFFREY B. KINDLER, P. HUNTER PHILBRICK, ALLEN R. THORPE, and STEPHEN H. WISE,<br><br>          Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>(1)  Breach of Fiduciary Duties<br>(2)  Aiding and Abetting Breach of Fiduciary Duties<br>(3)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(4)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Michael Daniels ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this action against PPD, Inc. ("PPD" or the "Company"), and the Company's Board of Directors (the "Board" or the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and

breaches of fiduciary duty as a result of efforts to sell the Company to Thermo Fisher Scientific Inc. ("Parent" or "Thermo Fisher" and together with PPD, the Board, the "Defendants"), through merger vehicle, Powder Acquisition Corp., as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on an all cash proposed transaction valued at approximately $17.4 billion (the "Proposed Transaction").

2.     The terms of the Proposed Transaction were memorialized in an April 16, 2021, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").  Under the terms of the Merger Agreement, PPD will become an indirect wholly-owned subsidiary of Parent, a subsidiary of the Thermo Fisher.  PPD public stockholders will receive, in exchange for each share of PPD common stock they own, $47.50 in cash.

3.     Thereafter, on May 19, 2021, PPD filed a Preliminary Information Statement on Form PREM14C (the "Information Statement") with the SEC in support of the Proposed Transaction.

4.     Plaintiff alleges that the Individual Defendants (defined herein) have violated the Exchange Act and breached their fiduciary duties by agreeing to the Proposed Transaction based on a flawed process which will result in inadequate compensation for Plaintiff.

5.     The Proposed Transaction is unfair and undervalued for a number of other reasons. Significantly, the Information Statement describes an insufficient process in which the Board rushed through an inadequate "sales process".  In addition the consummation of the Proposed Transaction is a foregone conclusion given that the Company's largest stockholders, including several funds affiliated with either of Hellman & Friedman LLC, The Carlyle Group, or The Clocktower Group, who collectively own approximately 60% of the outstanding stock of the

Company (collectively the "Majority Stockholders"), have agreed to vote in favor of the Proposed

Transaction, thus negating the need for a stockholder vote.

6.      In approving the Proposed Transaction, the Individual Defendants have breached

their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to

sell PPD without first taking steps to ensure that Plaintiff in his capacity as a Company public

stockholder would obtain adequate, fair and maximum consideration under the circumstances; and

(ii) engineering the Proposed Transaction to benefit themselves and/or Thermo Fisher without

regard for PPD's public stockholders.  Accordingly, this action seeks to enjoin the Proposed

Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to

Plaintiff and other PPD stockholders.

7.      Next, it appears as though the Board has entered into the Proposed Transaction to

procure for itself and senior management of the Company significant and immediate benefits with

no thought to Plaintiff, as well as the Company's public stockholders.  For instance, pursuant to

the terms of the Merger Agreement, upon the consummation of the Proposed Transaction,

Company Board Members and executive officers will be able to exchange all Company equity

awards for the merger consideration.

8.      In violation of the Exchange Act and in violation of their fiduciary duties,

Defendants caused to be filed the materially deficient Information Statement on May 14, 2021

with the SEC.  The Information Statement is materially deficient, deprives Plaintiff of the

information necessary to make an intelligent, informed and rational decision of whether to seek

appraisal of his shares rather than accept the consideration proffered in the Proposed Transaction,

and is thus in breach of Defendants fiduciary duties.  As detailed below, the Information Statement

omits and/or misrepresents material information concerning, among other things: (a) the sales

process and in particular certain conflicts of interest for management; (b) the financial projections

for PPD, provided by PPD to the Company Board's financial advisor J.P. Morgan Securities LLC

("J.P. Morgan"); and (c) the data and inputs underlying the financial valuation analyses, if any,

that purport to support the fairness opinions created by J.P. Morgan and provide to the Company

and the Board.

9.      Accordingly, this action seeks to compel the Individual Defendants to properly

exercise their fiduciary duties to Plaintiff.

10.      Absent judicial intervention, the Proposed Transaction will be consummated,

resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction or,

in the event the Proposed Transaction is consummated, to recover damages resulting from the

breaches of fiduciary duties by Defendants.

## PARTIES

11.      Plaintiff is a citizen of North Carolina and, at all times relevant hereto, has been a

PPD stockholder.

12.      Defendant is a leading global clinical research organization providing broad,

integrated drug development, laboratory and lifecycle management services.  PPD is incorporated

under the laws of the State of Delaware and has its principal place of business at 929 North Front

Street, Wilmington, North Carolina 28401.  Shares of PPD common stock are traded on the Nasdaq

Stock Exchange under the symbol "PPD."

13.      Defendant David Simmons ("Simmons") has been a Director of the Company at all

relevant times.  In addition, Simmons serves as the Company's Chairman of the Board and Chief

Executive Officer ("CEO").

14.      Defendant Joe Bress ("Bress") has been a director of the Company at all relevant

times.

15.     Defendant Stephen Ensley ("Ensley") has been a director of the Company at all relevant times.

16.     Defendant Maria Teresa Hilado ("Hilado") has been a director of the Company at all relevant times.

17.     Defendant Colin Hill ("Hill") has been a director of the Company at all relevant times.

18.     Defendant Jeffrey B. Kindler ("Kindler") has been a director of the Company at all relevant times.

19.     Defendant P. Hunter Philbrick ("Philbrick") has been a director of the Company at all relevant times.

20.     Defendant Allen R. Thorpe ("Thorpe") has been a director of the Company at all relevant times.

21.     Defendant Stephen H. Wise ("Wise") has been a director of the Company at all relevant times.

22.     Defendants identified in ¶¶ 13 - 21 are collectively referred to as the "Individual Defendants."

23.     Non-Defendant Thermo Fisher is the world leader in serving science, with annual revenue exceeding $30 billion.  Shares of Thermo Fisher common stock are traded on the NYSE under the symbol "TMO."

**JURISDICTION AND VENUE**

24.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

25.     Personal jurisdiction exists over each defendant because the Company maintains its principal place of business in this district, the defendants conduct business in or maintain operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the Nasdaq Stock Exchange which is headquartered in this District.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

27.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with PPD and owe the Company the duties of due care, loyalty, and good faith.

28.     By virtue of their positions as directors and/or officers of PPD, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause PPD to engage in the practices complained of herein.

29.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors

of a corporation must:

    a.   act with the requisite diligence and due care that is reasonable under the circumstances;

    b.   act in the best interest of the Company;

    c.   use reasonable means to obtain material information relating to a given action or decision;

    d.   refrain from acts involving conflicts of interest between the fulfillment of their roles in the Company and the fulfillment of any other roles or their personal affairs;

    e.   avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

    f.   disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the Company.

30.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of PPD, are obligated to refrain from:

    a.   participating in any transaction where the directors' or officers' loyalties are divided;

    b.   participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

    c.   unjustly enriching themselves at the expense or to the detriment of

the Company or its stockholders.

31.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to PPD, Plaintiff and the other public stockholders of PPD, including their duties of loyalty, good faith, and due care.

32.     As a result of the Individual Defendants' divided loyalties, Plaintiff will not receive adequate, fair or maximum value for his PPD common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

33.     PPD, together with its subsidiaries, provides drug development services to the biopharmaceutical industry worldwide. The Company operates through two segments, Clinical Development Services and Laboratory Services. It offers clinical development services, including product development and consulting, early development, Phases II-IV clinical trial management, accelerated enrollment, peri-and post-approval, and medical communications services. The Company also provides laboratory services comprising bioanalytical, biomarker, vaccine science, good manufacturing practice, and central laboratory services. It serves pharmaceutical, biotechnology, medical device, and government organizations, as well as other industry participants. The Company has a collaboration with Science 37 to design, build, test, implement, and execute digital trials using Science 37's DCT SaaS-based technology platform. PPD was founded in 1985 and is headquartered in Wilmington, North Carolina.

34.     The Company reported positive financial results in its most recent Press Release for the Fourth Quarter and Full Year 2020 Financial Results. For example, the Company reported fourth quarter and full year revenue of $1,364.3 million and $4,681.5

million, representing growth of 30.3% and 16.1% over the same periods in 2019, respectively. In addition, fourth quarter and full year net income of $73.1 million and $120.2 million, representing growth of 980.2% and 119.8% over the same periods in 2019, respectively.

35.     Speaking on the positive results, Defendant CEO Simmons commented in the April 27, 2021 Press Release, "'PPD's talent and culture have been instrumental to our success. The challenges of the pandemic put a spotlight on our people, differentiated capabilities and therapeutic expertise – and PPD excelled in that spotlight. Not only have we played a key role in developing vaccines and therapeutics to prevent and treat COVID-19, but our unwavering commitment to study continuity and deployment of innovative solutions in this dynamic environment produced outstanding financial results. As we add another year of double-digit growth to our long track record of strong performance, we are very well positioned for 2021.'"

36.     The sustained financials and optimism are not an anomaly, but rather, are indicative of a trend of continued success and future potential success by PPD.  Clearly, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

37.     Despite this potential, the Individual Defendants have caused PPD to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

38.     As detailed in the Information Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to by any means necessary irrespective of the price obtained.

39.    Primarily, the Information Statement gives no adequate explanation for why the Board failed to adequately protect minority stockholder interests, including failing to include a "majority of the minority" vote provision.

40.    Moreover, while the Information Statement indicates that a "Transaction Committee" was created to run the sales process the Information Statement fails to give an adequate explanation as to why all three members of the Transaction Committee were inside non-independent directors.

41.    Furthermore, the Information Statement does not give adequate information as to why the market check performed by J.P. Morgan was limited to only four potentially interested counterparties. Nor does it provide whether these contacted entities were strategic or financial in nature.

42.    In addition, the Information Statement is also unclear as to the existence or nature of any non-disclosure agreement entered into between PPD and any potentially interested third party, including Thermo Fisher, as part of the sales process, and if the terms of any such agreements included "don't-ask, don't-waive" provisions or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away.  Specifically, while the Information Statement describes such clauses in non-disclosure agreements with Thermo Fisher, it fails to discuss any such clause in relation to any non-disclosure agreements entered into with other potentially interested third parties, if any such agreements exist.

43.    It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

44.    On April 15, 2021, Thermo Fisher and PPD issued a joint press release announcing

the Proposed Transaction.  The press release stated, in relevant part:

> **WALTHAM, Mass. and WILMINGTON, N.C. (April 15, 2021)** – Thermo Fisher Scientific Inc. (NYSE: TMO) ("Thermo Fisher"), the world leader in serving science, and PPD, Inc. (Nasdaq: PPD) ("PPD"), a leading global provider of clinical research services to the pharma and biotech industry, today announced that their boards of directors have approved a definitive agreement under which Thermo Fisher will acquire PPD for $47.50 per share for a total cash purchase price of $17.4 billion plus the assumption of approximately $3.5 billion of net debt. This represents a premium of approximately 24% to the unaffected closing price of PPD's common stock on the Nasdaq as of Tuesday, April 13, 2021, or 32% to the 60-day VWAP inclusive of that date.
>
> PPD provides a broad range of clinical research and laboratory services to enable customers to accelerate innovation and increase drug development productivity. A leader in the growing $50 billion clinical research services industry, PPD has more than 26,000 colleagues operating in nearly 50 countries. In 2020, the company generated revenue of $4.7 billion. Upon close of the transaction, PPD will become part of Thermo Fisher's Laboratory Products and Services Segment.
>
> "Pharma and Biotech is our largest and fastest growing end market, and our customers value us as a strategic partner and an industry leader. The acquisition of PPD is a natural extension for Thermo Fisher and will enable us to provide these customers with important clinical research services and partner with them in new and exciting ways as they move a scientific idea to an approved medicine quickly, reliably and cost effectively," said Marc N. Casper, chairman, president and chief executive officer, Thermo Fisher Scientific. "Longer term, we plan to continue to invest in and connect the capabilities across the combined company to further help our customers accelerate innovation and drive productivity, while driving further value for our shareholders."
>
> David Simmons, chairman and chief executive officer, PPD, said, "This is a very exciting announcement for our shareholders and will provide customers with an even better opportunity to bring meaningful innovation to the market faster and more efficiently. Thermo Fisher is a world-class company with a very similar culture and values and will provide a great foundation for our colleagues to continue to deliver for our customers and to develop their own skills and careers."
>
> Casper added, "Both companies have complementary mission-driven cultures, and I can't wait to welcome PPD's colleagues from around the world to Thermo Fisher once the transaction is completed."
>
> **Benefits of the Transaction**
>
> **Establishes Thermo Fisher as One of the Global Leaders in the Attractive, High Growth Clinical Research Services Industry**

PPD serves a $50 billion industry forecasted to grow long-term in the mid-single digits, driven by scientific breakthroughs, the continued expected robust funding for drug discovery and the need for strategic suppliers for the pharma and biotech industry to help them bring safe and effective medicines to the patients that need them. PPD has invested significantly in its capabilities and is one of the leading global players providing services to both emerging biotech customers and to all of the top pharma companies in the world.

**Combination Further Enhances Thermo Fisher's Value Proposition for Pharma and Biotech Customers by Adding Highly Complementary Services**

Thermo Fisher is a leading supplier to the pharma and biotech industry, supporting research and development, clinical trials and production. PPD enhances Thermo Fisher's offering, bringing a proven drug development platform, excellent patient recruitment capabilities, strong laboratory services and a complementary reputation for excellent quality and service. These combined capabilities further enhance Thermo Fisher's value proposition to pharma and biotech customers and allow them to more efficiently access these services, which are key enablers of their success.

**Creates Meaningful Benefits for Customers**

In the near-term, Thermo Fisher's access to key decision makers in pharma and biotech companies will increase the opportunities for PPD to win additional work from existing and new customers as the pandemic has further highlighted the need for these customers to develop strategic relationships with their key suppliers. The combined company's extensive capabilities and knowledge in serving the pharma and biotech industry will enable new solutions for customers that create the potential to reduce the time and cost of the drug development process.

**Delivers Attractive Financial Benefits**

The transaction is expected to be immediately and significantly accretive to Thermo Fisher's adjusted EPS, adding $1.40 in the first 12 months after close. Thermo Fisher expects to realize total synergies of approximately $125 million by year three following close, consisting of approximately $75 million of cost synergies and approximately $50 million of adjusted operating income benefit from revenue-related synergies.

**Approvals and Financing**

The transaction, which is expected to be completed by the end of 2021, is subject to the satisfaction of customary closing conditions, including the receipt of applicable regulatory approvals.

In addition to board approval, shareholders holding in aggregate approximately 60% of the issued and outstanding shares of common stock of PPD have approved

the transaction by written consent. No further action by other PPD shareholders is required to approve the transaction.

Thermo Fisher has obtained committed bridge financing with respect to a portion of the purchase price. To fund the transaction, Thermo Fisher intends to use proceeds from debt financing and cash on hand.

***The Inadequate Merger Consideration***

45.     Significantly, the Company's financial prospects and opportunities for future growth establish the inadequacy of the merger consideration, as well as it significantly undervalues the Company. Moreover, the merger consideration does not adequately take into consideration the probable and predicted financial success of the Company.

46.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration the Company's potential financial success given its growing sales pipeline and new business direction.

47.     *Fierce Biotech*'s April 15, 2021 article covered the Proposed Transaction and similar mergers in the industry, "If a major medtech/testing company buying a CRO sounds familiar, it's right out of the LabCorp playbook, which a few years back nabbed CRO Covance for $5.6 billion. Thermo Fisher is going to try its hand using the same tactic, but with the much larger PPD. This comes not only after that Covance deal, but the more recent megamerger between Icon and PRA Health for $12 billion, as the CRO sector becomes buoyant in the M&A space once again The PPD deals sees the $187 billion market capped Thermo Fisher add a few billion on top of PPD's around $13 billion market cap, and add one of the world's largest CRO players to its bow… In the fourth quarter, income leapt 30.3% to $1.36 billion, compared to $1.04 billion for the last fourth quarter. This was boosted by two main areas: its clinical development services, making $1.1

billion, up 28.3% on the year-ago period, and its laboratory services, up 40.1% to $254.2 million…
It's also been heavily involved in running vaccine trials for COVID-19, including Moderna and
the National Institutes of Health's tests for the biotech's mRNA vaccine, which has been given
emergency use status in the U.S. and U.K."

48.     *MedCity News* released its analysis on the Proposed Transaction on April 15, 2021,
voicing the benefit Thermo Fisher is adding by acquiring PPD, "For much of its history, Thermo
Fisher has been a products provider. It sells a wide range of laboratory equipment as well as the
chemicals used in labs. Of the company's $32.1 billion in total 2020 revenue, $25.3 billion was
product revenue compared to $6.9 billion that came from providing services. But Thermo Fisher
has been delving deeper into providing services to its life sciences industry customers, and CEO
Marc Casper said that the PPD acquisition will enable the combined company to offer new ways
to reduce the time and the costs required to develop new drugs. Speaking on a conference call
Thursday, Casper acknowledged that he previously said his company was not interested in getting
into the CRO business. But customers changed the company's thinking. Casper said
pharmaceutical companies have indicated they want to consolidate their outsourcing, placing that
work in the hands of fewer vendors. Some of that change in thinking was driven by Covid-19, he
said. Also, a higher percentage of clinical trials are coming from smaller biotech companies, which
rely on CROs more heavily because they have limited internal capabilities to run clinical trials.
Casper said that PPD will enable his company to offer a more comprehensive lineup of services to
pharma and biotech companies throughout the cycle of a drug's development."

49.     The Proposed Transaction also represents a synergistic benefit to Thermo Fisher,
as explained in the April 15, 2021 *Wilmington Biz* article, "Cost synergies will come from
eliminating redundant public company costs and deployment of its PPI (producer price index)

business to drive productivity and sourcing benefits, Williamson said. He said the combination of Thermo Fisher's resources and capabilities as a supplier to the pharma and biotech industry would increase opportunities for PPD with both new and existing customers. In addition to revenue synergies, Thermo Fisher has 'many more opportunities to generate additional benefits for customers for many years to come,' Williamson said… Near-term benefits of the acquisition, according to the release, include Thermo Fisher's access to key decision-makers in pharma and biotech companies, which will 'increase the opportunities for PPD to win additional work from existing and new customers as the pandemic has further highlighted the need for these customers to develop strategic relationships with their key suppliers.'"

50.     Clearly, while the deal will be beneficial to Thermo Fisher it comes at great expense to Plaintiff.

51.     Moreover, post-closure, PPD stockholders will be frozen out of any future benefit from their investment in PPD's bright future.

52.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for the Thermo Fisher at the expense of Plaintiff as a PPD stockholder, which clearly indicates that Plaintiff was not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

53.     The Merger Agreement contains certain provisions that unduly benefit the Thermo Fisher by making an alternative transaction either prohibitively expensive or otherwise impossible. Notably, in the event of termination, the merger agreement requires PPD to pay up to $520,354,225 to the Thermo Fisher and/or its affiliates, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, PPD must pay this termination fee even if it

consummates any competing Company Takeover Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

54. The Merger Agreement also contains a "No Solicitation; Adverse Recommendation Change" provision that restricts PPD from considering alternative acquisition proposals by, *inter alia*, constraining PPD's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide "*Company Takeover Proposal*."

55. Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide to the Thermo Fisher and/or its affiliates information in order to match any other offer, thus providing the Thermo Fisher access to the unsolicited bidder's financial information and giving Parent the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Thermo Fisher.

56. These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and Plaintiff.

57. Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

*Potential Conflicts of Interest*

58.    The breakdown of the benefits of the deal indicate that PPD insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of PPD.

59.    Most notably, the entire Proposed Transaction itself is designed to promote the interest of the Majority Stockholders at all costs, including at the expense of Plaintiff and other public stockholders of PPD.  While the Information Statement indicates that Majority Stockholders and other institutional investors own approximately 60% of the Company in the aggregate, as per the below, it fails to provide how much this will translate to in merger compensation:

| Name of Beneficial Owner | Common Stock Beneficially Owned | |
| --- | --- | --- |
| | Shares | Percentage |
| **5% Stockholders:** | | |
| H&F Investors[1] | 132,841,266 | 37.8 |
| Carlyle Investor[2] | 55,722,733 | 15.9 |
| GIC Investor[3] | 21,453,252 | 6.1 |
| **Directors and Named Executive Officers:** | | |
| David Simmons[4] | 4,034,269 | 1.1 |
| Joe Bress[5] | — | — |
| Stephen Ensley[6] | — | — |
| Maria Teresa Hilado | 37,199 | * |
| Colin Hill | 14,166 | * |
| Jeffrey Kindler[7] | 115,823 | * |
| P. Hunter Philbrick[6] | — | — |
| Allen Thorpe[6] | — | — |
| Stephen Wise[5] | — | — |
| William Sharbaugh[8] | 1,196,778 | * |
| Christopher Scully[9] | 412,959 | * |
| Anshul Thakral[10] | 292,963 | * |
| David Johnston[11] | 236,433 | * |
| All directors and executive officers as a group (19 persons)[12] | 7,154,028 | 2.0 |

60.    Moreover, certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.  Notably, many Company insiders, including several of the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for

large cash pay days upon the consummation of the Proposed Transaction.   However the Information Statement fails to provide an accounting for such holdings or the compensation which will be afforded upon the consummation of the Proposed Transaction.

61.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement. Again, the Information Statement fails to provide an accounting for such equity award holdings or the compensation which will be afforded upon the consummation of the Proposed Transaction.

62.     Additionally, certain employment agreements with certain PPD executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them tens of millions of dollars, compensation not shared by PPD common stockholders.  Notably these payments will be granted to Company insiders as follows:

| Name | Cash(1) ($) | Equity(2) ($) | Perquisites/ Benefits(3) ($) | Tax Reimbursement (4) ($) | Total ($)(5) |
|---|---|---|---|---|---|
| David Simmons | 7,063,014 | 81,349,759 | 27,121 | 10,091,631 | 98,531,525 |
| Christopher Scully | 1,147,344 | 15,617,812 | 13,850 | — | 16,779,006 |
| William Sharbaugh | 1,222,483 | 18,777,204 | 20,939 | — | 20,020,626 |
| Anshul Thakral | 1,038,073 | 12,481,553 | 49,629 | — | 13,569,255 |
| David Johnston | 800,573 | 12,435,441 | 13,959 | — | 13,249,973 |

63.     Moreover, the Information Statement is silent as to any post-close employment agreements Company insiders may have signed with Thermo Fisher.

64.     The Information Statement must adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the

Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

65.    Thus, while the Merger is not in the best interest of PPD stockholders, it will produce lucrative benefits for the Company's officers and directors, and especially for the Majority Stockholders.

***The Materially Misleading and/or Incomplete Information Statement***

66.    On May 14, 2021, the Defendants caused to be filed with the SEC a materially misleading and incomplete Information Statement that, in violation of Federal Securities Laws and their fiduciary duties, failed to provide the Plaintiff in his capacity as a Company stockholder with material information necessary to make a decision regarding whether to seek appraisal for his shares and/or provides him with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process Leading Up to the Proposed Transaction*

67.    Specifically, the Information Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Information Statement fails to disclose:

   a.   The specific reasoning as to why the Board failed to adequately protect minority stockholder interests, including failing to include a "majority of the minority" vote provision;

   b.   The specific reasoning as to why as to why the Transaction Committee created

to run the sales process was composed entirely of inside directors rather than
independent directors was;

c.   The specific reasoning as to why J.P. Morgan's market outreach was composed
of only four potential counterparties;

d.   The financial or strategic nature of the four potential counterparties contacted
by J.P. Morgan;

e.   The specific nature of all non-disclosure agreements entered into by the
Company as part of the sales process, including with Thermo Fisher, the
specific terms of all standstill restrictions contained in each agreement,
including all specific conditions, if any, under which such provisions would fall
away, and all specific differences between the entered into confidentiality
agreements and the reasoning as to why they differed from one another;

f.   Adequate information regarding communications regarding post-transaction
employment during the negotiation of the underlying transaction must be
disclosed to stockholders. Communications regarding post-transaction
employment during the negotiation of the underlying transaction must be
disclosed to stockholders. This information is necessary for stockholders to
understand potential conflicts of interest of management and the Board, as that
information provides illumination concerning motivations that would prevent
fiduciaries from acting solely in the best interests of the Company's
stockholders.

_Omissions and/or Material Misrepresentations Concerning PPD's Financial Projections_

68.   The Information Statement fails to provide material information concerning

financial projections provided and/or adjusted by PPD management and relied upon by J.P. Morgan in its analyses. The Information Statement discloses management-prepared financial projections for which are insufficient and/or are materially misleading.

69.     The Information Statement indicates that in connection with the rendering of Citi's fairness opinion, Citi reviewed "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business".

70.     Accordingly, the Information Statement should have, but fails to provide, certain information in the projections that PPD management provided to the Board, and J.P. Morgan. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

71.     With respect to the "Base Case" Projections provided, the Information Statement fails to disclose material line items for the following metrics:

> a.  Adjusted EBITDA Pre-Share Based Compensation, including the underlying necessary metrics of: net income or loss attributable to common stockholders of the Company; the specific adjustments made for changes in recapitalization investment portfolio consideration; net income or loss attributable to noncontrolling interest; interest expense, net; provision for or benefit from income taxes; depreciation and amortization; non-operating income or expense; and impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's

ongoing operating performance;

    b.   Adjusted EBITDA Post-Share Based Compensation, including the underlying necessary metrics of: all metrics used to calculate Adjusted EBITDA Pre-Share Based Compensation, plus share based compensation expense; and

    c.   Adjusted Earnings Per Share, including the underlying necessary metrics of: diluted earnings per share attributable to common stockholders of the Company before amortization and; non-operating income or expense; impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance.

72.    With respect to the "Upside Case" Projections provided, the Information Statement fails to disclose material line items for the following metrics:

    a.   Adjusted EBITDA Pre-Share Based Compensation, including the underlying necessary metrics of: net income or loss attributable to common stockholders of the Company; the specific adjustments made for changes in recapitalization investment portfolio consideration; net income or loss attributable to noncontrolling interest; interest expense, net; provision for or benefit from income taxes; depreciation and amortization; non-operating income or expense; and impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance;

    b.   Adjusted EBITDA Post-Share Based Compensation, including the underlying necessary metrics of: all metrics used to calculate Adjusted EBITDA Pre-Share

Based Compensation, plus share based compensation expense; and

    c.    Adjusted Earnings Per Share, including the underlying necessary metrics of: diluted earnings per share attributable to common stockholders of the Company before amortization and; non-operating income or expense; impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance.

73.    With respect to the "Final Base Case" Projections provided, the Information Statement fails to disclose material line items for the following metrics:

    a.    Adjusted EBITDA Pre-Share Based Compensation, including the underlying necessary metrics of: net income or loss attributable to common stockholders of the Company; the specific adjustments made for changes in recapitalization investment portfolio consideration; net income or loss attributable to noncontrolling interest; interest expense, net; provision for or benefit from income taxes; depreciation and amortization; non-operating income or expense; and impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance;

    b.    Adjusted EBITDA Post-Share Based Compensation, including the underlying necessary metrics of: all metrics used to calculate Adjusted EBITDA Pre-Share Based Compensation, plus share based compensation expense;

    c.    Unlevered Free Cash Flow, including the underlying necessary metrics of: cash generated from operating activities; the specific adjustments made for cash paid

for interest expense; and capital expenditures;

    d.    Adjusted Earnings Per Share, including the underlying necessary metrics of: diluted earnings per share attributable to common stockholders of the Company before amortization and; non-operating income or expense; impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance.

74.    With respect to the "Final Upside Case" Projections provided, the Information Statement fails to disclose material line items for the following metrics:

    a.    Adjusted EBITDA Pre-Share Based Compensation, including the underlying necessary metrics of: net income or loss attributable to common stockholders of the Company; the specific adjustments made for changes in recapitalization investment portfolio consideration; net income or loss attributable to noncontrolling interest; interest expense, net; provision for or benefit from income taxes; depreciation and amortization; non-operating income or expense; and impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance;

    b.    Adjusted EBITDA Post-Share Based Compensation, including the underlying necessary metrics of: all metrics used to calculate Adjusted EBITDA Pre-Share Based Compensation, plus share based compensation expense;

    c.    Unlevered Free Cash Flow, including the underlying necessary metrics of: cash generated from operating activities; the specific adjustments made for cash paid

for interest expense; and capital expenditures;

d.   Adjusted Earnings Per Share, including the underlying necessary metrics of: diluted earnings per share attributable to common stockholders of the Company before amortization and; non-operating income or expense; impacts of certain non-cash, unusual or other items that are included in net income or loss that management did not consider indicative of the Company's ongoing operating performance.

75.   The Information Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

76.   This information is necessary to provide Plaintiff in his capacity as a Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff as not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the sales process and whether or not to seek appraisal for their shares.

77.   Without accurate projection data presented in the Information Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of J.P. Morgan's financial analyses, or make an informed decision whether to seek appraisal for his Company stock rather than accept the consideration proffered in the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Information Statement.

_Omissions and/or Material Misrepresentations Concerning the Financial Analyses by J.P. Morgan_

78.   In the Information Statement, J.P. Morgan describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions

fail to include necessary underlying data, support for conclusions, or the existence of, or basis for,

underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the

valuations or evaluate the fairness opinions.

79.     With respect to the *Public Trading Multiples* Analysis, the Information Statement

fails to disclose the following:

a.   The specific multiples for each selected company;

b.   The specific inputs and assumptions used to determine the utilized CY2021E
     FV/EBITDA reference range for the Company of 15.8x to 18.6x; and

c.   The specific inputs and assumptions used to determine the utilized CY2021 P/E
     reference range of 19.8x to 27.1x.

80.     With respect to the *Selected Transactions Analysis*, the Information Statement fails

to disclose the following:

a.   The specific multiples for each selected transaction;

b.   The value of each selected transaction;

c.   The date on which each selected transaction closed; and

d.   The specific inputs and assumptions used to determine the utilized LTM
     FV/EBITDA reference range for the Company of 12.5x to 24.2x.

81.     With respect to the *Discounted Cash Flow Analysis*, the Information Statement fails

to disclose the following:

a.   The range of terminal values for the Company which were calculated;

b.   The specific inputs and assumptions used to determine the utilized perpetual
     growth rate range of 3.50% to 4.00%;

c.   The specific inputs and assumptions used to determine the utilized discount rate

range of 7.50% to 8.50%;

    d.   PPD's weighted average cost of capital;

    e.   The adjusted implied firm values for the Company's debt and cash; and

    f.   The fully diluted number of shares of Company common stock outstanding utilized.

82.    These disclosures are critical for Plaintiff in his capacity as a Company stockholder to be able to make an informed decision on whether to seek appraisal for his shares rather than accept the consideration offered in the Proposed Transaction.

83.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves his interests.   Moreover, without the key financial information and related disclosures, Plaintiff in his capacity as a Company public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests.   As such, the Board has breached their fiduciary duties by failing to include such information in the Information Statement.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### <u>(Against the Individual Defendants)</u>

84.    Plaintiff repeats all previous allegations as if set forth in full herein.

85.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff.

86.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff of

the true value of his investment in PPD.

87.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to Plaintiff by entering into the Proposed Transaction through a flawed and unfair process and failing to meet their obligations to make complete and accurate disclosures regarding this process and the data and analyses underlying the Proposed Transaction.

88.     Indeed, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff all material information necessary for him to make an informed decision on whether to tender his shares in favor of the Proposed Transaction.

89.     The Individual Defendants dominate and control the business and corporate affairs of PPD, and are in possession of private corporate information concerning PPD's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and Plaintiff which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value without the disclosure of all proper material information.

90.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff.

91.     As a result of the actions of the Individual Defendants, Plaintiff will suffer irreparable injury in that he has not and will be able to make an informed decision with respect to the Proposed Transaction.

92.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff, all to the irreparable harm of the Plaintiff.

93.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### Against Defendant PPD

94.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

95.     Defendant PPD knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

96.     As a result of this conduct, Plaintiff has been and will be damaged in that he has been and will be prevented from being able to make an informed decision with respect to the Proposed Transaction.

97.     Plaintiff has no adequate remedy at law.

## THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

98.     Plaintiff repeats all previous allegations as if set forth in full herein

99.     Defendants have disseminated the Information Statement in favor of the Proposed Transaction.

100.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

101.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

102.    The Information Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Information Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

103.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

104.    The Individual Defendants were at least negligent in filing an Information Statement that was materially misleading and/or omitted material facts necessary to make the Information Statement not misleading.

105.    The misrepresentations and omissions in the Information Statement are material to Plaintiff and the Class, and at present fail to provide complete information if such misrepresentations and omissions are not corrected.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against All Defendants)

106.    Plaintiff repeats all previous allegations as if set forth in full herein.

107.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Information Statement was materially misleading to Company stockholders.

108.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Information Statement and nevertheless approved,

ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Information Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Information Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

109.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of PPD's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Information Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Information Statement and are therefore responsible and liable for the misrepresentations contained herein.

110.    The Individual Defendants acted as controlling persons of PPD within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause PPD to engage in the wrongful conduct complained of herein. The Individual Defendants controlled PPD and all of its employees. As alleged above, PPD is a primary violator of Section 14 of the Exchange Act and SEC Rule Information Statement. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor, and against the Defendants, as follows:

A.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

B.      Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

D.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 28, 2021

**BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*